27 C.C.P.A.(Patents)

## SMITH v. BOUSQUET.

### Patent Appeal No. 4235.

Court of Customs and Patent Appeals.
April 29, 1940.
Rehearing Denied June 21, 1940.

Mastin G. White, of Washington, D. C. (Irvin G. Menikheim, of Washington, D. C., of counsel), for appellant.

John P. Hancock and Albert B. Griggs, both of Wilmington, Del. (Chester H. Biesterfeld, of Wilmington, Del., of counsel), for appellee.

158

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of the invention defined in the two counts in issue to appellee, Euclid W. Bousquet.

The interference is between appellant's application, No. 729,830, filed June 9, 1934, and appellee's application, No. 737,046, filed July 26, 1934.

The invention in issue relates to insecticides, and is sufficiently described in the involved counts which read:

"1. An insecticide containing as its essential active ingredient phenthiazine.

"2. An insecticidal composition comprising a water-insoluble thio-di-arylamine."

As originally declared, the interference involved count 1 only, which originated in appellant's application. On motion of appellee, count 2 was added.

It appears from the decision of the Primary Examiner on the motion of Bousquet to amend the interference that thio-di-arylamine, called for in count 2, is generic to and includes phenthiazine, called for in count 1.

Appellee is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

In his decision, the Examiner of Interferences stated that phenthiazine and thio-di-arylamine are old compounds, and that the invention resides solely in the discovery that those compounds are useful as insecticides. The examiner further stated that the counts in issue are not limited to any specific insecticidal use, but are sufficiently broad to have application to any type of insect whether in the larval or adult state; that the terms "insecticide," in count 1, and "insecticidal composition," in count 2, should be interpreted to mean "a material which will kill at least one species of insects (or its larva) when applied under the usual conditions of that insect's natural or adapted environment, as distinguished from artificial or special laboratory conditions which are not comparable to those commonly encountered in nature"; and that—

"Insects, like other living organisms, vary widely in their susceptibility to a particular toxic material. Thus a substance which destroys ants may have little or no effect on the common carpet beetle. Additionally, the mode of application is dependent upon the type of insect and its environment or host. A substance soluble in kerosene may be applicable as a fly spray, but obviously lacks utility as a means of killing weevils in grain stored in elevators or warehouses. Likewise, the utility of a given material as an insecticide cannot be measured by an arbitrary laboratory standard, but must be determined by actual test under conditions at least approximating those of intended use.

"In view of these facts, it is clear that the suggested use of a chemical compound, or group of compounds, as an insecticide broadly is not sufficient to constitute an invention. It must also be shown that a mode of application was contemplated which is operative and possesses practical utility against at least one designated insect.

"It is * * * the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention *as it is thereafter to be applied in practice* that constitutes an available conception within the meaning of the patent law" (Lotterhand v. Hanson, 1904 C.D. 39; 108 Off.Gaz. 799.) (Italics added by examiner of interferences.)

It appears from the record that appellant is a chemist in the United States Department of Agriculture; that in June, 1933, appellant prepared and sent a quantity of phenthiazine to Dr. F. L. Campbell, who during the period of time in question was in charge of a laboratory of the United States Government in which entomologists were engaged in testing certain organic compounds to determine their value as insecticides.

After reviewing the evidence submitted by appellant, the Examiner of Interferences held that, by virtue of certain laboratory tests on mosquito larvae, appellant had established conception of the invention and reduction of it to practice on March 28, 1934. Relative to those tests, the examiner said: "In Campbell's quarterly report for January—March 1934, exhibit 12, and in the monthly report for March 1934, exhibit 27, it is stated that phenthiazine is toxic to mosquito larvae in dilutions up to 1 part per million. There is no descrip-

tion in the exhibits of the experiments or tests upon which the statement is based, and neither Campbell nor Bulger described them in the oral testimony. Apparently from an inspection of Bulger's laboratory notes, exhibits 25 and 26, the tests with mosquito larvae were made by adding a stock solution of the thiodiarylamine to a flask containing 100 mosquito larvae in an aqueous medium, the amount of stock solution being so proportioned to the volume of liquid in the flask that the desired concentration of chemical could be readily and accurately obtained. This is substantially in accord with the description of prior similar experiments involving other organic compounds, found in Smith Exhibit 4."

The Examiner of Interferences further stated that, although prior to March 28, 1934, appellant had suggested that phenthiazine might be useful as an insecticide, he did not know "what insects, if any, it might be effective against nor did he contemplate any particular mode of application which would possess practical utility. As admitted in Smith's brief, pages 10 and 11, *there is no known relation between chemical structure and insecticidal action, and therefore it is obviously impossible to predict or determine in advance of actual experiment whether or not any specific compound or group of compounds is a new and useful insecticide.*

"In the experimental sciences of chemistry and biology this element of unpredictability frequently prevents a conception separated from actual experiment and test. *Here the work of conception and reduction to practice goes forward in such a way that no date can be fixed as subsequent to conception but prior to reduction to practice.* The inventor conjectures that some act or material will subserve a given purpose and having tried it finds that it accomplishes the end, *and at no time before the successful experiment can it be said that a conception of the invention exists in the inventor's mind. Until that instant it is mere speculation or possibly a probable deduction from facts already known;* but the conception does not reach a definite and final form until the completion of acts which likewise satisfy the requirements of a reduction to practice.

"The laboratory tests on mosquito larva, as hereinabove reviewed, are considered as sufficiently approximating natural conditions to effectively demonstrate that phenthiazine possesses practical utility as an insecticide for this species of insect. Upon the completion of this experiment Smith was in complete possession of the invention, and accordingly it is held that on March 28, 1934, Smith conceived and reduced to practice." (Italics ours.)

It will be observed from the quoted excerpt from his decision that the Examiner of Interferences was of opinion that in the experimental sciences of chemistry and biology it is frequently the case that conception and reduction to practice of an invention are necessarily concurrent; that the involved invention is of that class; and that, therefore, neither of the parties to the interference actually conceived the involved invention until he had successfully reduced it to practice.

It appears from their brief that counsel for appellant are in agreement with the holding of the examiner relative to conception and reduction to practice in cases of this character, and also as to the examiner's holding that appellant conceived and reduced the invention to practice on March 28, 1934.

It appears from the record that appellee is a research chemist in the employ of the E. I. du Pont de Nemours & Company, Wilmington, Delaware; that in December, 1930, appellee suggested to his superior, Dr. Paul S. Salzberg, that the compounds called for in the counts in issue might prove valuable as insecticides. No tests were made of phenthiazine, however, until June 2, 1931, when, as stated in the decision of the Examiner of Interferences, appellee "attempted to test the insecticidal action of some of his numerous previously suggested materials, by preparing kerosene solutions and spraying captive flies therewith. Included in the group tested on that date was phenthiazine. Although it was Bousquet's intention to prepare 10% solutions of his materials, he discovered that he could not dissolve phenthiazine in kerosene to any appreciable extent, and subsequently he learned that the solution contained but 0.44% phenthiazine (Bousquet exhibits 8 and 10).

"According to Bousquet, in these tests he placed a few flies in a twelve liter balloon flask and sprayed an indeterminate amount of the kerosene solution into said flask. After the flies became inactive, they were removed from the flask and placed in a separate container with food and water for 24 hours, the number of insects still inactive at that time being con-

sidered as dead. Exhibit 9 purports to be a record of this test, but because the data appearing thereon is so meager it is of little probative value, and adds nothing material to Bousquet's oral testimony. Salzberg avers that he saw exhibits 8, 9, and 10 shortly after the dates appearing thereon, but it is manifest from his testimony respecting Bousquet's fly spray tests that his information is based on oral and written reports of Bousquet, and that he made no personal observations of said tests. It is well settled that the testimony of the inventor must be corroborated in all material details to be entitled to any consideration in proving inventive acts. Accordingly, the evidence relative Bousquet's fly-spraying experiments is held to be insufficient to prove that he made such tests at the time and in the manner alleged.

"Even if Bousquet's story were sufficiently corroborated, the test purporting to have been made in June 1931, was at best an unsuccessful experiment. The twelve liter flask in which the flies were confined is a very small volume within which to attempt to test the efficacy of a material which in practice would normally be used in spaces many times as large. Thus 12 liters is but 0.424 cubic feet, while a small room (9x12) would have a volume of about 1,000 cubic feet or nearly 2,500 times as great.

"Into this extremely small enclosure, an unspecified amount of kerosene with a minute quantity of phenthiazine was sprayed. In the absence of a check run with substantially the same quantity of kerosene under otherwise comparable conditions, it is impossible to ascertain whether the results were due to the kerosene or the phenthiazine."

The Examiner of Interferences accordingly held that the tests made by appellee on flies were not sufficient to indicate that phenthiazine was useful as an insecticide.

We have carefully examined the evidence pertaining to appellee's 1931 "fly tests" and are in accord with the reasoning of the Examiner of Interferences and the conclusion reached by him that those tests were insufficient to warrant a holding that appellee had established either conception of the invention or a successful reduction of it to practice.

The record also contains evidence of other tests made on behalf of appellee by his witness Dr. H. F. Dietz, an entomologist in the Ohio Agricultural Experimental Station at Wooster, Ohio. On August 9, 1931, the witness Dietz made some tests with phenthiazine—referred to in appellee's record as "IN–76." According to the testimony of the witness and a report made by him relative to those tests (appellee's exhibit No. 23) he was unable to get a satisfactory dispersion of phenthiazine with either benzene or pyridine, and although he finally made a test with a dispersion of phenthiazine in a "Bindex emulsion," "Even this dispersion," the witness stated, "was not satisfactory." Relative to that test, which consisted of spraying black chrysanthemum aphids, the witness testified that he secured about a "35% kill," and that he regarded the tests as indicating that phenthiazine had some "toxic action" and was worthy of additional experiments. (It should be stated at this point that the witness Dietz was experimenting with many other compounds to determine whether they had value as insecticides.)

The Examiner of Interferences reviewed the record relative to the 1931 Dietz tests somewhat in detail, and concluded that those tests did not establish that phenthiazine had insecticidal value.

We find nothing in the record to indicate that the tests performed by the witness Dietz in 1931 were satisfactory, or that it was determined therefrom that phenthiazine was useful as an insecticide.

Other tests of phenthiazine were made on behalf of appellee by his witness Matthew A. Vogel, under the direction of the witness Dietz, commencing in August, 1933, and concluding sometime in October of that year. Relative to those tests, the Examiner of Interferences said:

"Beginning in August of that year certain experiments were carried out by one M. A. Vogel, more or less under the direction of Dietz, on some of the materials previously included in Dietz' 'high spot' survey as well as on other suggested materials. Vogel's experiments were intended to demonstrate the value, if any, of these substances as a spraying agent against certain pests attacking orchard crops. Briefly, the procedure involved the spraying of apples with a dispersion in which the concentration of the materials being tested ranged from 1 part in 500 to 1 part in 2,000, and, after the coating had dried, five newly hatched larvae were placed thereon. The sprayed apples and larvae were thereupon placed in suitable cabinets a week or more, after which they were carefully examined

to determine the number of larvae that had succeeded in penetrating the skin of the fruit and establishing themselves therein (Bousquet exhibits 42 and 43).

*"Obviously the conditions of such experiments are not the same as are encountered in actual spraying operations in the orchard.* However, everything considered, *they are deemed to approximate ordinary conditions sufficiently to demonstrate whether or not the material tested is useful for the intended purpose.* On this basis, the codling moth and oriental fruit moth tests will be analyzed. Vogel completed the phenthiazine runs sometime in October 1933 as shown by his laboratory records exhibit 42, and included the data thereof in his report to the du Pont organization on November 13, 1933 (exhibit 43). The results on *codling moth* seem to be somewhat inconclusive, especially in the absence of check data on IN–210, the other material in the spray apparently utilized as a spreader. However, it would appear from the tabulated data on page 16 of exhibit 43 that IN–210 does not add materially to the effectiveness of the spraying mixtures. This seems to be true also of IN–179 used as a spreader with the phenthiazine in the tests on oriental fruit moth larvae.

"This evidence is deemed to establish that at least as early as November 13, 1933, the party Bousquet was in possession of the invention in issue as a result of an experimental study which demonstrated the utility of phenthiazine as a spraying agent against chewing insects such as *codling moth* and *oriental fruit moth larvae*." (Italics ours.)

It will be observed from the quoted excerpt that the Examiner of Interferences held that the laboratory tests made on "codling moth" and "oriental fruit moth larvae" by the witness Vogel during the period from August, 1933, to sometime in October of that year were of such character and the results obtained were such as to warrant the holding that appellee had conceived the invention and reduced it to practice at least as early as November 13, 1933, on which date the witness made a report to the du Pont Company which included certain data of the tests made and the results obtained.

In the spring of 1934, beginning on March 28, another series of tests of phenthiazine was made on behalf of appellee by his witness H. G. Guy, an entomologist at Newark, Delaware, who made *weekly* reports (appellee's exhibits Nos. 75 to 84, inclusive, dated, respectively, March 28, April 4, May 8, May 17, May 29, June 19, July 3, July 11, July 17, and July 26, 1934), and also *monthly* reports ·(appellee's exhibits Nos. 85, 86, and 87, dated, respectively, May 10, June 10, and July 9, 1934).

Relative to the tests made by H. G. Guy, the Examiner of Interferences said: "In his [Guy's] reports for March 28 and April 4, 1934 (exhibits 75, 76), Guy states that phenthiazine as a dust gave good control of Mexican Bean beetle. On May 8, 1934 (exhibit 77), he reported that good control was also obtained with this material as a dust on foliage infested with tent caterpillar, although there was slight injury to the foliage. Guy's May 29, 1934 report (exhibit 79) indicates partial control of the Colorado potato beetle, with phenthiazine both as a dust and as a spray. *None of these reports describes the experimental technique employed in this work, and Guy's stipulated testimony throws no light on this matter. This evidence, accordingly is too uncertain and indefinite to be accepted as establishing additional reductions to practice of the invention on behalf of Bousquet.* However, the undisputed facts in connection therewith lend additional support to the finding that Vogel's tests with phenthiazine demonstrated the utility of said compound as an insecticide. This later work also indicates more or less conclusively that the du Pont organization considered phenthiazine as a satisfactory insecticide for orchard use and was diligently endeavoring to secure as much information as possible concerning other insecticidal applications to which it might be put." (Italics ours.)

The Examiner of Interferences being of opinion that appellant was entitled to a date not earlier than March 28, 1934, for conception and reduction of the invention to practice, and that appellee had conceived the invention and reduced it to practice as early as November 13, 1933, awarded priority of invention to appellee.

The Board of Appeals concurred in the views expressed by the Examiner of Interferences relative to the tests performed by the witness Vogel on behalf of appellee during the period from August, 1933, to sometime in October of that year, and, in answer to an argument apparently made by counsel for appellant, said: "The *counts do not require that the foliage be unharmed.* Furthermore, it is possible that even if the

foliage were slightly harmed, the compound would still be a good insecticide and we believe the tests followed by Vogel are sufficient to indicate to anyone skilled in the art that phenthiazine is a valuable insecticide and that *no burning is obtained as stated by Salzberg* (Q.A. 135—Bousquet Record)." (Italics ours.)

Appellee's witness Salzberg, referred to in the quoted excerpt from the board's decision, stated, in substance on his direct examination, that there were "preliminary indications" that the use of phenthiazine as an insecticide might cause injury to foliage, and that the tests conducted by the witness *H. G. Guy* on behalf of appellee established that phenthiazine would not injure foliage.

We are unable to ascertain from its decision whether the Board of Appeals concurred in the holding of the Examiner of Interferences that appellant was entitled to conception of the invention and its reduction to practice by the "mosquito larva" tests made on March 28, 1934. In this connection, the board said: "As inferred from page 6 of Bousquet's brief, the examiner was inconsistent to accord Smith the date of his mosquito larva experiments and deny to Bousquet the date of his experiments on flies."

It appears from the record that the witness Guy first referred to the effect of phenthiazine on foliage in his weekly report of May 8, 1934 (appellee's exhibit No. 77), wherein it is stated that "IND76 [phenthiazine] as a dust at 1–10 gave 79% control of the Eastern Tent Caterpillar *but caused slight injury to the foliage* [italics ours]," and that in his monthly report, dated July 9, 1934 (appellee's exhibit No. 87), he again referred to the effect of phenthiazine on foliage and stated that on June 15, 1934, a spray consisting of .1% "IND76" (phenthiazine) and .1% Nekal solution was used on the Colorado potato beetle, and that it was determined on June 19, 1934, that the mixture caused no apparent injury to the foliage (presumably potato foliage).

It may be said at this point that it appears from the witness Guy's monthly report, dated June 10, 1934 (appellee's exhibit No. 86), that, although a mixture used as an insecticide may not be injurious to one type of foliage, it may be injurious to another, so that evidence that "IND76" (phenthiazine) was not injurious to potato foliage does not establish that it

would not be injurious to orchard foliage, such as apple—the environment of the codling moth and oriental fruit moth larvae, which pests were the subjects of tests made on behalf of appellee by the witness Matthew A. Vogel during the period from August, 1933, to sometime in October of that year, and which tests, as hereinbefore noted, the tribunals of the Patent Office held established conception of the invention and reduction of it to practice by appellee.

It further appears from the record that the first favorable report made by the witness Guy relative to the effect of phenthiazine on foliage other than potato appeared in his weekly report, dated July 17, 1934 (appellee's exhibit No. 83), wherein it is stated that *"IND76* [phenthiazine] *.1% in a .1% Nekal solution caused no injury to apples, peach, potato and bean foliage* [italics ours]," and that his next favorable report appeared in his weekly report, dated July 26, 1934 (appellee's exhibit No. 84), wherein it is stated that "IND76–L2, L3, L4 as 1–10 dusts" *had no injurious effect on* "apple, peach, bean and potato foliage." (Italics ours.)

It is not questioned here by counsel for either of the parties that thio-di-arylamine and phenthiazine are old compounds, and that the invention here involved lies in a particular use of such compounds; that is, as the essential active ingredients in insecticides.

The evidence of record relative to conception and reduction to practice should be, and accordingly has been, considered in conformity with the character of the invention here involved, and we are in agreement with the views expressed by the Examiner of Interferences that the record in the case does not warrant a holding that either of the parties established conception of the involved invention prior to, or independent of, a reduction of it to practice. Furthermore, although both parties suggested that phenthiazine might be used as an insecticide prior to their experimental tests, it is apparent from the record that neither had in mind at the time the suggestions were originally made, nor at any time thereafter, until successful tests, if any, were made, what insects, if any, it might be effective against, or how it might be applied to produce the desired results. Accordingly, neither party had a definite idea of the "complete and operative invention" here involved prior

to a successful reduction—actual or constructive—of it to practice. See Harry P. Townsend v. Henry L. Smith, 36 F.2d 292, 17 C.C.P.A., Patents, 647, 651.

■ Although there is evidence of some activity by appellee and some of his witnesses, particularly the witness Dietz, between August, 1931, and August, 1933, we are of opinion, as was the Examiner of Interferences, that no successful tests were performed on behalf of appellee during that period. Accordingly, having hereinbefore held that appellee's 1931 "fly tests" and the test made on behalf of appellee by his witness Dietz on black chrysanthemum aphids in 1931 were not sufficient to warrant a holding that appellee had either conceived the invention or reduced it to practice during the year 1931, we proceed to consider the evidence relative to the tests performed by the witness Vogel on behalf of appellee during the period commencing in August, 1933, and ending sometime in October of that year. It is unnecessary to explain the nature and details of the Vogel tests, owing to the fact that we have hereinbefore quoted an accurate description of them from the decision of the Examiner of Interferences.

As hereinbefore noted, the Examiner of Interferences and the Board of Appeals were of opinion that the Vogel tests were sufficient to warrant a holding that appellee was in possession of the invention as early as November 13, 1933, on which date the witness Vogel reported to the du Pont Company concerning his tests and the results obtained therefrom.

We think it is clear from the evidence of record that the laboratory tests on "codling moth" and "oriental fruit moth larvae" completed by Mr. Vogel in October, 1933, were, *under conditions prevailing in the laboratory,* satisfactory from the standpoint of "control" or "kill."

In his decision holding that the Vogel tests were sufficient to establish that on November 13, 1933, appellee was in possession of the invention, the Examiner of Interferences stated that, although the conditions prevailing in the laboratory were "not the same as are encountered in actual spraying operations in the orchard," they were "deemed to approximate ordinary conditions sufficiently to demonstrate whether or not the material tested is useful for the intended purpose."

It is apparent from his reports, however, that the witness Vogel was not so certain that the tests performed by him established that the "material tested" was useful for its intended purpose. In his report to the du Pont Company under date of November 13, 1933 (appellee's exhibit No. 43), Mr. Vogel, at page 13, stated: "IN–76 [phenthiazine] shows some promise and especially when the spreading agent *IN–179* is used." He further stated on page 14 of that exhibit that—

"In the foregoing report, it should be borne in mind that the results given pertain to kill alone and that the record of performance of the several materials [including phenthiazine] *pertain to laboratory conditions.* No data is at hand which throws any light on the *possible* performance of the chemicals used *if applied under outdoor conditions where the influence of such factors as variable temperature, rain, sunlight, etc., would be felt. Neither is there any information relative to the possible effect on growing plants.*

"It is possible that the out of doors performance might vary somewhat from that recorded here. Some of the better materials might not show up quite so well and some of the poorer materials might be better, but it is thought that the spread is sufficiently great between the general group of materials which have been listed as offering promise and those not promising that the tentative grouping given is fairly dependable. When all is said and done, kill of the insect is the first requirement of any insecticide and following this may properly come refinements of the data pertaining to kill." (Italics ours.)

It is evident from the quoted excerpt from appellee's exhibit No. 43 that at the time the witness Vogel made that report—November 13, 1933—he was of opinion that it was necessary to test phenthiazine "under outdoor conditions where the influence of such factors as variable temperature, rain, sunlight, etc., would be felt" in order to determine whether it possessed practical utility as an insecticide from the standpoint of "kill," and that tests were also necessary to determine whether it would be injurious to orchard foliage.

That appellee and the witness Salzberg understood fully the importance of testing phenthiazine "under outdoor conditions," as suggested by Mr. Vogel, in order to determine whether it possessed practical utility as an insecticide from the standpoint of "kill," and also the importance of ascertaining by proper tests, as was also

suggested by Mr. Vogel, whether phenthiazine would be injurious to foliage, is evident not only from the testimony of the witness Salzberg, hereinbefore referred to, but also from a letter dated *April 24, 1934* (appellee's exhibit No. 72), and addressed to the witness Earl B. Alvord, an employee of the Grasselli Chemical Company, Cleveland, Ohio, a subsidiary of the du Pont Company, wherein it is stated: "With reference to your letter of April 18, to Dr. Dietz concerning compounds for trial in Dr. Porter's field tests, the logical candidate in addition to Contact No. 1 *would be IN–76* [phenthiazine]. *However, in view of recent experiments which indicate burning with this material, I question whether it would be advisable to test IN–76 outside until we have more information concerning its safety to foliage and possible means of avoiding it.*" (Italics supplied.)

Furthermore, so far as the record shows, it was not until July 17, 1934, approximately five weeks after appellant's involved application was filed in the Patent Office, that appellee was informed by the witness Guy's weekly report (appellee's exhibit No. 83) that the compounds here involved would not cause injury to so-called "orchard foliage."

It may be said at this point that the witness Guy did not disclose in any of his reports the nature or character of the tests performed by him, nor is there any explanation of the nature or character of those tests in his stipulated testimony. Accordingly, we are in agreement with the holding of the Examiner of Interferences that the evidence of record relative to the tests made by the witness Guy is insufficient to establish either conception of the involved invention or reduction of it to practice by appellee. Furthermore, there is nothing in the record to establish that *appellee* or his witnesses at any time prior to the filing of *appellant's* involved application ever performed any experiments under outdoor conditions where, as stated by the witness Vogel in his report to the du Pont Company on November 13, 1933 (appellee's exhibit No. 43), "the influence of such factors as variable temperature, rain, sunlight, etc., would be felt."

It would seem to be clear that in order to determine whether thio-di-arylamine and phenthiazine possess utility as insecticides for "codling moth" and "oriental fruit moth larvae" it would be necessary to ascertain by proper tests that those compounds, when "applied under outdoor conditions," would kill such pests without injury to foliage.

There being no evidence that appellee or his witnesses made any such tests, we are of opinion that appellee has failed to establish that he was in possession of the invention at any time prior to the filing of appellant's application—June 9, 1934. Accordingly, it is unnecessary for us to determine whether or not the tests performed by appellant on March 28, 1934, and the results obtained thereby, were sufficient to establish conception and reduction to practice of the involved invention.

Inasmuch as appellee has failed to establish either conception of the involved invention or reduction of it to practice prior to the filing of appellant's application—June 9, 1934—we must hold that appellant is entitled to an award of priority. Accordingly, the decision of the Board of Appeals is reversed.

Reversed.