## LENSCH et al. v. METALLIZING CO. OF AMERICA et al.

No. 201.–Civil.

District Court, S. D. California, Central Division.

June 14, 1941.

Avery M. Blount and Kelly L. Taulbee, both of Los Angeles, Cal., for plaintiffs.

William R. Litzenberg and Irving S. Baltimore, both of Los Angeles, Cal., for defendants.

JENNEY, District Judge.

This case was tried by the late District Judge William P. James, and, after his death, was transferred to this court. By approved stipulation, the cause is to be decided by me upon the pleadings and the testimony, oral and documentary, and the physical exhibits, received during the trial. Briefs and arguments have been supplied by counsel for each side.

The complaint, filed January 13, 1939, contains the usual allegations of patent grant, ownership, marking, notice and infringement. The patent in suit, No. 2,096,-119, for a metal spray gun was applied for April 13, 1936, and was issued to plaintiffs as co-inventors on October 19, 1937. The invention of the patent sued on is alleged to provide "certain new and novel features and advantages beyond the improvements in metal spraying devices as set out in United States Letters patent granted to (plaintiffs) Lensch and Leder, January 8, 1935, on application filed August 29, 1932." The complaint prays for an accounting of profits and damages, triple damages, costs, and a permanent injunction.

The principal issues raised by the pleadings are those of validity and infringement. In respect of validity, defendants' answer sets up certain special defenses, such as want of invention, want of novelty, and anticipation resulting from the publication of certain domestic and foreign patents. During the trial, defendants offered proof pertaining to certain statutory defenses which had not been pleaded. The court permitted defendants to file an amendment to the answer, wherein it was then alleged that the invention of the patent in suit was "known and used and circularized and offered for sale for more than two years prior to the filing date of the application on which said patent was issued." No prior publication was specifically alleged.

The patent in suit relates to a metal spray gun consisting of two principal parts— a power unit and a combustion unit. Through the use of this tool, metal in the form of wire is reduced to a molten state by means of acetylene gas and oxygen. Knurled wheels, located in an open channel between the walls of the turbine housing and the transmission housing, deliver the wire. This molten metal, fed in a continuous stream through the nozzle of the gun, is then seized upon by an air blast which tends to atomize the metal. The air is, of course, delivered separately from the gas and oxygen. The atoms or particles of molten metal are microscopic in size after leaving the nozzle of the gun and are in a thoroughly molten state when they impinge upon the surface to be sprayed. The velocity of the plaintiffs' spray gun at the nozzle is approximately forty thousand feet per minute. The power unit and the combustion unit are releasably associated at an abutment between the nozzle base of the combustion unit and the walls of the power unit casting.

The claims of the patent relied upon by plaintiffs are as follows:

"2. In a metal spray gun, a power unit comprising a member adapted to carry a turbine, transmission gears, and wire feeding wheels, said member including housings for said turbine and gears and an open channel in its walls exteriorly of said housings, said wheels being adapted for rotation in said channel, a combustion unit comprising a member adapted to carry combustible gases and compressed air, and having control valves and a nozzle base, a metal spraying nozzle secured to said base and adapted to receive the gases and compressed air of the combustion unit, and means including an abutment between the nozzle base and the walls of said member for releasably confining said units in operative association whereby said wire feeding wheels are visibly disposed in said channel.

"3. In a metal spray gun, a power unit comprising a member adapted to carry a turbine, transmission gears and a pair of wire feeding wheels, said member providing housings for said turbine and gears and having an open channel in its walls between said housings, one of said wire feeding wheels being mounted on a shaft extending from the transmission gears beyond the housing thereof and adapted to rotate in said channel, the other of said wire feeding wheels being pivotally mounted on said member and adapted for rotation in said channel, and means for holding the said wire feeding wheels in cooperative engagement during the feeding of wire.

"4. A wire feeding mechanism for a metal spray gun comprising a member having a turbine, transmission gears, and a pair of wire feeding wheels, means for effecting the visible feed of wire through said

wheels comprising: an open channel in the walls of said member between the turbine and gear housings thereof, a wire feeding wheel mounted between the sides of said channel and actuated by said transmission gears, a wire feeding wheel hingedly mounted on said member and adapted for rotation in said channel, and a spring latch for holding said hingedly mounted wire feeding wheel in engagement with said first wire feeding wheel during the feeding of wire."

Figures 1, 2 and 3 referred to in the patent are as follows:

Oct. 19, 1937. R. LENSCH ET AL 2,096,119

METAL SPRAY GUN

Filed April 13, 1936 3 Sheets-Sheet 1

FIG.1.

Inventors
Rudolph Lensch and
Paul Leder

By
ATTORNEY

Oct. 19, 1937. R. LENSCH ET AL 2,096,119

METAL SPRAY GUN

Filed April 13, 1936 3 Sheets-Sheet 2

Inventors
Rudolph Lensch
and Paul Leder

ATTORNEY

Plaintiffs contend that certain important features of their device are novel over all the prior art disclosures, and claim that the infringing device known as the "Mogul" gun is a substantial replica of their device. This "Mogul" gun is an improvement by defendants upon an earlier gun made by them and known as the "Metallizer" gun. In support of their contention of infringement, plaintiffs point out that the alleged infringing device comprises a power unit including a wire feeding unit and a combustion unit, and that the upper wire wheel occupies the identical relationship that it does in the patented device. They urge that the upper wire wheel operates in an open channel, such as the patent discloses, and that the wire feeding is visible to the operator, which same advantage is derivable from use of the patented gun. In case of back fire, the open channel will permit the safe dissipation of accumulated gases (just as it does in the patented device). In case of damage to the combustion unit, as in the patented structure, that unit may be removed and repaired or replaced at rel-

atively slight expense, when compared with repairing or replacing the entire gun—which would ordinarily be necessary in case of damage to the Metallizer or to spray guns of the prior art.

Defendants, in the main, admit these statements as to their device, but challenge those relating to the "open channel" and "visibility" to the operator. They deny infringement and urge that, if plaintiffs' claims are interpreted sufficiently broadly to show infringement, they are invalid on the prior art.

■ Let us consider first the contention of defendants that there was a constructive abandonment of plaintiffs' alleged invention prior to the application for letters patent. It is conceded that a patent is void if the invention covered thereby was in public use or on sale earlier than two years (under the applicable statute) before the patent application. R.S. 4886, 35 U. S.C.A. § 31. As to what is a public use or an offer for sale is a question of fact. It has been repeatedly held that the burden of proof of an anticipation is upon the party asserting it, and that this burden must be sustained by clear and convincing evidence. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153; Symington v. National Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045; Eibel Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Stoody Co. v. Mills Alloys, 9 Cir., 67 F.2d 807, Judge Sawtelle. Cf. Paraffine Companies v. McEverlast, Inc., 9 Cir., 84 F.2d 335, Judge Denman. And it has also been held that abandonment must be proved in like manner. Research Products Co. v. Tretolite Co., 9 Cir., 106 F.2d 530, 534; Byrne Mfg. Co. v. American Flange & Mfg. Co., 6 Cir., 87 F.2d 783; Walker on Patents, Deller's Edition, § 100.

■ Experimental use is never public use within the meaning of the statute, if it is conducted in good faith for the purpose of testing the qualities of the invention. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071; Research Products Co. v. Tretolite Co., supra; Walker, §§ 84 and 85; Meigs' "Time, the Essence of Patent Law," p. 8.

■ As hereinbefore indicated, it is alleged in defendants' answer that the invention in suit was "known and used and circularized and offered for sale for more than two years," etc. It is provided, in effect, in R.S. 4886, as amended, that a patent is invalid if the alleged invention has been patented or described in any printed publication in this or any foreign country before the invention or discovery thereof or more than two years prior to the patent application. (See R.S. 4920, as amended, 35 U.S.C.A. § 69). Whether by "circularized" the pleader meant "published", or "offered for sale", the character of evidence required under this provision in proof thereof should be, in principle, no different from proof of anticipation or abandonment.

■■ When these rules of law are applied to the evidence on this point, we find it falls far short of the required proof, to establish that the patent invention "was known and used and circularized and offered for sale" more than two years prior to April 13, 1936, the date of the application therefor. No physical or documentary evidence of substantial probative value was supplied, and the oral testimony was contradictory and unsatisfactory. Certain it is that the testimony did not show satisfactorily that the one metal spray gun, manufactured by plaintiffs, was subjected to anything more than a private or experimental use, prior to April 13, 1934. Nor was any publication properly shown within the meaning of the statute. Granting the witnesses to be of the highest character and entirely conscientious in their desire to tell the truth, oral testimony, unsupported by exhibits or documents, tending to show use, sale, abandonment or publication, is unsatisfactory, particularly if the oral testimony be taken after the lapse of several years. The Barbed Wire Patent, supra; Deering v. Winona Harvester Works, supra.

Defendants did not specifically plead the defense of constructive abandonment and did not comply with the statute in giving thirty days' notice thereof prior to trial. Upon the objection being raised, Judge James permitted an amendment to the answer to incorporate the defense. He then adjourned court for one day to give plaintiffs an opportunity to make the necessary preparations for meeting the additional defense. Because of our view, as hereinbefore expressed, on the sufficiency of the evidence, it is unnecessary for us to determine whether or not the new Federal Rules of Civil Procedure, 28 U.S.C.A. following

section 723c, abrogate or supersede this statute. See note of Advisory Committee to Rule 8(b). See also Oswell v. Bloomfield, 7 Cir., 113 F.2d 377.

Defendants' answer sets up ten patents which are alleged to anticipate the patent in suit. Three of those are French and two are British. The foreign patents are apparently presented to show the state of the art. The patents alleged to be anticipatory are as follows:

1. Morf, No. 1,128,175, Feb. 9, 1915;

2. British, No. 268,431, Mar. 31, 1927;

3. French, No. 639,039, Mar. 5, 1928;

4. French, No. 680,554, Jan. 22, 1930 (filed Dec., 1928);

5. French, No. 741,740, Dec. 13, 1932;

6. Irons, No. 1,917,523, July 11, 1933;

7. British, No. 440,248, Dec. 23, 1935;

8. Lensch and Leder, No. 1,987,016, Jan. 8, 1935;

9. Schoop, No. 1,617,166, Feb. 8, 1927;

10. Valentine, No. 2,102,395, Dec. 14, 1937.

Probably the first inventive act in the art of spraying molten metal onto a surface was described in the Morf U. S. patent issued February 9, 1915 (No. 1, supra), in which the idea of reducing metal to molten form and spraying it onto a surface was disclosed to the public; and in this patent the idea of moving a rod into intersection with burning gases, under pressure for the purpose, is also shown and explained.[1] See Emmett v. Metals Processing Corporation, 9 Cir., April 7, 1941, 118 F.2d 796. After the invention of the general idea of converting a metal rod or wire into a spray of liquid, then engineering and mechanical skill came into play to provide different means and mechanisms for accomplishing the process or invention.

It seems to the court that the old French patent No. 680,554, filed December, 1928 (No. 4, supra), took up a large part of the possible inventive field in this art. It teaches (1) a box or body with a handle, with means therein for feeding a metal wire through the box into a gas combustion unit or nozzle mounted thereon, with means, also, for supplying the combustible gases into the nozzle in order to melt the metal wire and carry it through the noz-

zle; (2) a turbine for driving the wire feeding gears; (3) a spring-pressed upper feed wheel, bearing yieldingly on the wire in order to obtain the pressure for proper feeding; (4) a separate housing for the turbine in the box and also separate housing in the box for the turbine-driven gears; (5) a space or passageway or channel for the feed wheels and wire being moved to the nozzle.

As stated, the application for the patent sued on indicated many features as objects of the invention. Most of these were already known in the art. We think that a detailed discussion of all of the prior art patents contained in the record is not necessary. The file wrapper reveals that, in the first patent office action on petitioners' original application, the examiner rejected Claims 1 and 4 on the Irons patent, No. 1,-917,523, issued July 11, 1933, (No. 6, supra); and Claims 2 and 3 on the British patent, No. 268,431 of 1927 (No. 2, supra). These two were the only patents considered by the patent office examiner. Claim 5 was rejected as drawn to an old combination.[2]

That the general objects of the invention set out in the patent specifications were already known in the art is also shown by some of the patents not considered by the patent office, as well as the patents mentioned. The idea of "controlling the wire feed through the gun whereby any desired pressure may be exerted on the wire" is taught in the Valentine patent (No. 10, supra), by the Irons patent (No. 6, supra), and by the French patent (No. 4, supra). The idea of providing "a hinged latch construction whereby the top feeding wheel is releasably confined" and whereby it "can be unlatched and lifted on its hinged connection out of the way" are also shown in the old French patent (No. 4, supra) and in plaintiffs' old patent (No. 8, supra). The idea of forming "the combustion unit of a gun as a separate and distinct entity from the mechanical unit or power plant of the gun" was also old in the French patent (No. 4, supra), in the Metallizing gun of the defendants and in the Valentine patent (No. 10, supra). The idea of providing in a spray gun "a casting as an integral part which will contain the housings for encompassing the gears of the transmission

---

[1] The Schoop patent No. 1,128,058 (not in evidence) issued February 9, 1915, the same date as the Morf patent, also relates to metal spraying.

[2] Claim 6 was allowed and became Claim 1 of the amended claims. It has to do with a baffle in the nozzle base and is not involved herein.

as well as the turbine for driving the transmission gears and to so form the casting that it will have a channel way for the feed wire, free and clear of the interiors of the gear and turbine housings" was also old in the French patent (No. 4, supra) and in the French gun which was received in evidence as defendants' Exhibit "N" and in the publication "El Soldador," defendants' Exhibit "O".

By amendment filed in the application, the attorney for applicants, plaintiffs herein, cancelled Claims 1, 2, 3, 4 and 5; thereby acquiescing in the rejection of the original claims on the patents cited, and submitted Claims 2, 3 and 4 in suit, hereinbefore set out in full.

 This is admittedly a patent of a secondary nature, which must be strictly construed. Walker on Patents, (Deller's Edition) § 471, p. 1709 et seq. Whenever an applicant acquiesces in the rejection of his claims of a broader scope, on references cited by the patent office, and accepts claims of a narrower scope, he will not thereafter be permitted to seek to include, through an application of the doctrine of equivalents or otherwise, subject matter which appears to have been relinquished. Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707; I. T. S. Rubber Co. v. Essex Co., 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335.

An examination of the original claims, as presented to the patent office and rejected, shows the following as to certain claims:

Claim 2. "In a metal spray gun, a power unit comprising a member adapted to carry a turbine, transmission gears and wire feeding wheels, said member having a passageway exteriorly of the gear housings thereof and the walls of said passageway providing a channel; a shaft extending from the transmission gears having a wire feeding wheel adapted to rotate in said channel, a second wire feeding wheel mounted on a hinge secured to the body of said member and means for holding the said hinged wire feeding wheel in rotatable engagement with said first wire feeding wheel."

Claim 3. "In a metal spray gun, a unitary member comprising the power plant thereof, said member having a turbine, transmission gears and wire feeding device, a channel way in said member free and clear of the interiors of its gear chambers, said wire feeding device comprising an upper and lower wheel and each of said wheels having a gear portion and a knurled portion, said lower wheel being adapted to rotate between the walls of said channel and said upper wheel having a pivotal mounting attached to the power plant member, and means for bringing the gear portion of the upper wire feeding wheel into meshed engagement with the gear portion of the lower wire feeding wheel during the feeding of wire through the knurled portions of said wheels."

In these claims, which were so rejected on Irons (No. 6, supra) and the British patent (No. 2, supra), the only two patents cited, the broad reference is to "a passageway exteriorly of the gear housings thereof and the walls of the said passageway providing a channel" and "a channel way." Necessarily, there must be a space or a passageway or a channel through which the wire may pass and in which the knurled wheels may operate to feed the wire. There is nothing said in these claims, it will be noticed, about the channel being "open." It might be simply a chamber or a space in the form of a channel in the box or body—just as in most of the box type of spray guns in the field.

In the final Claims 2, 3 and 4, as allowed and hereinbefore quoted, the following limiting structural features are shown: The reference is not to a "channel" or a "passageway" as in the original claims, but, in each instance, to an "open channel." The final words of the single sentence of Claim 2, which apparently refers to the entire claim, are: "whereby said wire feeding wheels are *visibly* disposed in said channel" (italics ours); the words "said channel," in turn, referring back to the words "open channel." The abutment referred to in this claim is at one side only and to this the nozzle base is attached by Screws 63. This construction makes it possible to permit the cutting away of the opposite side, leaving the space completely open for the pipes, etc. (See Figures 1, 2 and 3 of the drawings, supra.) Claim 3 contains this limitation: "having an *open channel* in its walls *between* said housings" (italics ours). Claim 4 reads in part: "means for effecting the *visible feed* in the walls of said member *between* the turbine and gear housings thereof * * *" (italics ours). The Irons patent (No. 6, supra) and the British patent (No. 2, supra), cited by the examiner against the original claims, clearly have the features

of a passageway or space or channel or channel way—whatever one chooses to call it. So do most of the devices then in the field. Hence, apparently, applicants amended their application to provide for an "open channel" between the walls of the housings in the body, thus securing their patent.

Subjecting plaintiffs' Claims 2, 3 and 4, in suit, to a critical examination, we are forced to the conclusion that applicants voluntarily limited these claims so as to differentiate their structure from the references cited, their own original structure, and other devices well known in the art. Possible irregularities in wire feed—particularly with the softer metals such as lead, tin and zinc—had caused inequalities in the metal sprayed deposits, and had resulted in frequent stopping of operations for correction. Applicants proposed to afford a means whereby the wire feeding could be constantly within the operator's vision, making it possible to correct irregularities in feeding with their resultant and expensive shutdowns.

In plaintiffs' gun visibility during operation is always present. The wire feed wheels are visible from the rear, and the righthand side; the construction giving bearings for both ends of the shafts without using the closed box type of body. In the Mogul gun, during operations, only the outer end of the rear wire guide can be seen as it projects out of the body. From the left hand, the side of the gear wheel attached to the upper feed wheel is visible, but it is hardly possible to see either the feed wheel itself or the moving wire. Certainly it would be impractical to attempt such an observation during operations. The feeding is not visible from the righthand side and it would be impossible to operate the gun and at the same time peer down from the top or front and see the wire passing into the combustion chamber.

██ Practically all the guns in the art had facilities for inspection after shutdown. Most of these provided a hinged cover of the body for this purpose. Inspection, however, is one thing and observation during actual operations is quite another. The open or cutaway body of plaintiffs' gun provides that visibility which applicants apparently sought. It seems to the court that, to construe these claims as readable on defendants' device, would be to give them a construction which would render the claims invalid on the prior art.

██ If there be any ambiguity or if the true scope of applicants' invention is not clear, our Ninth Circuit Court of Appeals has in effect held that reference may be made to the file wrapper and arguments. Fullerton Walnut Growers' Ass'n v. Anderson-Barngrover Mfg. Co., 9 Cir., 166 F. 443, 452. See, also, Lektophone Corporation v. Rola Co., D.C., 27 F.2d 758, affirmed, 9 Cir., 34 F.2d 764. This we believe to be the proper interpretation of the decision of the Supreme Court in Keystone Driller Co. v. Northwest Engineering Corp., 1935, 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747. (For a discussion of the rule in this circuit and in other circuits, see "File Wrapper Estoppel" by Vern L. Oldham in 20 Journal of the Patent Office Society 115 (1938) and case note in 8 George Washington Law Review 871 (March, 1940).)

If, then, the scope of plaintiffs' claims is not entirely clear, let us see what arguments counsel for applicants used in order to persuade the examiner to allow the amended claims, after he had rejected the original claims. We quote (Record pp 106-8):

"Relative to Irons, No. 1,917,523: It is desired to note that Irons does not provide for the visible feed of the wire through the gun. He does not contemplate a wire feeding mechanism other than the 'conventional' construction which includes the wire feeding mechanism and feed wheels in the same housing without the ability to see the wire except by shutting off the tool and opening the cover of the mechanism housing, such, for example, as the Schoop type of wire feeding mechanism as contained in a square box housing. While Irons does provide separated power and combustion units, joining them together for operation, his structure does not teach applicant that with the conventional square box gear and feed wheel housing a channel can be formed exteriorly of the walls of the mechanism housing by the abutment of the nozzle base and the gear housing for the reception of the wire feeding wheels and so that the feed wheels will be open to view and the wire passing therethrough can be observed in its feeding. This utility in a metal spray gun is of great importance to a gun operator, particularly when inequalities in the metal sprayed deposits, due to irregularity of wire feed, require wire adjustments to be made while the gun is operating. Furthermore, the balling up of the wire, particularly with the softer metals such as

lead, tin and zinc, requires expensive shutdowns and results in low output of the tool."

Then, referring to the earlier patent of plaintiffs, No. 1,987,016 (No. 8, supra), counsel urges:

"It is desired to make this patent of record in this issue, as it has a direct bearing upon the removal of the wire feeding wheels of a metal spray gun from the gear box and mechanism contained therein, whereby visible feed of the wire is occasioned and the destruction of the gears and parts of the feeding mechanism from particles of the wire cut off by the knurled feed wheels is done away with. * * *."

"The new claims herewith presented are thought to fully differentiate applicants' structure over the references cited as well as over their original structure, and favorable consideration and allowance of same is courteously asked."

Within the limits indicated, the court finds the claims of the patent valid, but not infringed.

Counsel for defendants will prepare and submit, within twenty days, under Rule 8 of this court, findings of fact and conclusions of law and form of decree, in accordance with the foregoing. Objections thereto shall be filed within ten days thereafter.