**BOURNE v. JONES.**

**No. 756–M–Civil.**

United States District Court,
S. D. Florida, Miami Division.

July 24, 1951.

Rehearing Denied July 2, 1952.

Allen Clements, Miami, Fla., and Hal H. McCaghren, West Palm Beach, Fla., for plaintiff.

Earnest, Lewis, Smith & Jones, West Palm Beach, Fla., R. K. Lewis, Akron, Ohio, and Semmes, Keegin, Robinson & Semmes, Washington, D. C., for defendant, Luther Jones.

WHITEHURST, District Judge.

The plaintiff in this suit, Dr. Benjamin Arthur Bourne, in 1936 applied for and was granted plant patents on three varieties of sugar cane, which he bred in 1930 and 1931. This suit was subsequently brought against the defendant, Luther Jones, claiming that the defendant had infringed plaintiff's patents and praying for injunctive relief and an accounting.

The suit involves the validity of plant patents numbers 203, 210 and 220 granted under Title 35, § 31, U.S.C. The plaintiff applied for a patent covering sugar cane variety F31–962 on May 11, 1936, on which application plant patent 203 was issued on October 27, 1936; and applied for a patent covering sugar cane variety F30–35 on August 10, 1936, on which application plant patent 210 was issued on December 29, 1936; and applied for a patent covering sugar cane variety F30–436 on October 1, 1936, on which application plant patent 220 was issued on January 19, 1937.

The background of this suit begins with a serious sugar cane disease infection in Porto Rico and in the state of Louisiana which was the major sugar producing area in the continental United States. This disease occurred in the late teens and early twenties of this century and was of such serious proportions that the very existence of the industry was threatened. Consequently, the United States Department of Agriculture initiated an investigation of this disease with the purpose of controlling it in order to preserve the sugar produc-

ing industry. As a result of this investigation, a search was begun to discover new varieties of sugar cane that were inherently immune to the industry destroying disease, and, also, that would give an increased sugar yield.

In attacking the problem and in undertaking to breed new varieties of sugar cane, Collins Key (now known as Miami Beach) was selected as a breeding site because Florida was the only part of the United States where climatic conditions existed that would permit the blooming of the sugar cane plant. This breeding station was soon moved to and located on the shore of Lake Okeechobee at Canal Point, Florida. For the breeding purposes, parental stock was brought together at this breeding station from various parts of the world. Several hundred varieties of several different sugar cane species were imported through the facilities of the Department of Agriculture so the breeders could try to combine in one individual plant the qualities that were needed in meeting the disease situation.

In June 1926, the plaintiff was employed by the United States Department of Agriculture at the Canal Point Station to continue the work that was already in progress there, namely, the crossing of sugar cane varieties in order to achieve the result of producing disease resistant and adapted sugar cane varieties for the Gulf States. Plaintiff continued work at the Canal Point Station until June 1929, when he became associated with the Southern Sugar Company of Clewiston, Florida, which employment lasted until that corporation went into receivership in September 1930. This corporation was subsequently reorganized into the United States Sugar Corporation.

In 1930, the State of Florida, through the University of Florida, had begun a sugar cane investigation program to produce a cane better adapted to south Florida. This research centered at the Florida Agricultural Experiment Station at Belle Glade, Florida (hereinafter referred to as Everglades Experiment Station). To begin this research program, the director of the Everglades Experiment Station, Dr. R. V. Allison, employed a staff to handle cane breed-

ing and sugar cane investigations in that area. In June 1930, Dr. Allison employed Mr. F. D. Stevens, an experienced sugar cane agronomist from the United States Department of Agriculture, Houma, Louisiana, station, to handle the sugar cane agronomic investigation. In September 1930, Dr. Allison employed the plaintiff, then "Mr." B. A. Bourne, an experienced cane breeder, to handle the cane breeding work, with the title of Associate Pathologist. The breeding and agronomic phases were separate but inter-related dependent parts of a joint project. This is indisputable, as evidenced by the testimony of Dr. Allison and as documented by the project statements and progress reports required by the University of Florida of both Stevens and Bourne. These annual progress reports were forwarded to the main Experiment Station at Gainesville, Florida, said reports forming the basis for state appropriations to finance the project. Dr. Allison testifies that the agronomic work performed by Stevens was entirely indispensable to the final determination of the economic values in the newly developed canes. Any selection of these canes would have to be based on the joint efforts and results of the work conducted by the two men, Stevens and Bourne. Only from the work of both these men could there be a certain determination of the characteristics of a newly developed cane. The two men were co-workers in every sense as admitted by the plaintiff. Each submitted reports of his work to the other as observations and developments were made. Neither was independent but was a subservient part of a program carried on by the State of Florida to improve the horticulture of sugar cane.

The plaintiff's connection with the State of Florida began in September 1930 and lasted until December 1934 when plaintiff resigned his position and was employed by the United States Sugar Corporation. Plaintiff maintains that during his entire term with the Everglades Experiment Station he was head of the Research Department of the United States Sugar Corporation, although his only compensation from the corporation during this period was in the form of a credit against the mortgage on the plaintiff's home held by a subsidiary of the corporation.

In breeding new varieties of sugar cane, the first step is to select parents embodying desirable characteristics and establish them in experimental blocks fairly close to each other to provide for cross pollination. The actual cross pollination is done in the morning period when atmospheric conditions are suitable. The tassels of the two paired canes are shaken together to provide for the pollination of the female parent, following which the seed will develop in about three or four weeks, depending on weather conditions. After harvesting, the seed is thoroughly dried and planted immediately in carefully controlled seed "flats". Each cross can produce up to 1500 seeds and no two seeds will produce exactly similar seedlings. Seedlings are then set out in rows in the field, extreme care being taken to keep each exactly labeled. Each seedling produces a "stool", or a clump of stalks, which is initially observed by the cane breeder.

It was the system at the Everglades Experiment Station for Bourne to make the crosses, harvest and plant the seed, set out the seedlings, and make note of the mature seedling stools and test them individually for total solids, disease resistance, habit and general vigor, and then select certain individuals for further tests, at the same time giving the selected seedlings an identification number. (With respect to the plant covered by plant patent No. 203, Bourne gave that seedling identification number F31–962, the "F" meaning that it was bred in Florida at Florida Experiment Station at Belle Glade, the "31" meaning that it was a seedling of a cross made in 1931, and the "962" meaning that it was the 962nd selected seedling of the crosses made in 1931.) The jointed stalks of the mature seedling were then cut into pieces, leaving an "eye" in each piece which would germinate and asexually reproduce a plant having exactly the same characteristics as the original seedling, or, in other words, bred true. Bourne took half the seed pieces of the original stool for the purposes of his pathological tests, and gave the other half to Stevens for his agronomic

tests. Stevens then made what is called a line test by planting his seed pieces in a row or line from which growth various tests were made to determine the sugar yield from the variety. The varieties showing good growth characteristics, resistance to disease, and a high sugar yield were then put into increase plots for further propagation and tests. The next step was a replicated plot test from which very accurate yield determinations could be made. From the tests made by both men, the characteristics of a sugar cane variety could be accurately determined. It was from these tests that selection of the patented varieties was made.

Bourne cross pollinated several varieties of sugar cane in December 1930 and December of 1931 to produce the seed from which these patented varieties had their origin. At that time Bourne was employed by the State of Florida at the Everglades Experiment Station as a sugar cane breeder and sugar cane pathologist. He did his experimental work on land made available to the Everglades Experiment Station by the U. S. Sugar Corporation under a cooperative breeding program between the U. S. Department of Agriculture and Florida Experiment Station and U. S. Sugar Corporation. Out of more than a thousand of original plants grown from the seeds produced by the 1930 crosses, Bourne selected some 92 varieties for further testing and selection. Crosses made in 1931 produced seed for 14,000 seedlings, of which 1106 varieties were selected for further study. After the original stools were harvested, Bourne divided into halves the seed pieces from those initially selected as having some promise. It is evident from the program set for this research, as well as the progress reports issued by Bourne and Stevens, that Bourne's next effort with respect to those varieties was primarily a pathological study, while Stevens' work was to further test the varieties in order to determine and select the superior varieties with respect to yield and growth characteristics.

The defendant has introduced considerable evidence into the record about the work of Stevens from the time the line test plantings were made until huge areas of commercial plantings were made. The record is clear that Stevens conducted extensive line tests of the different varieties of cane, made available by the work of Bourne, at various locations around Lake Okeechobee as well as throughout Florida. Stevens used his own discretion in selecting varieties for further tests and eliminating others as they proved unsatisfactory. Although Stevens and Bourne performed their own tests on their own plantings, they shared data. Stevens also performed tests on the three patented varieties as to their adaptability to various soils, and observed their resistance or immunity to disease, and the length of time required for the cane to mature. He recorded other factors of commercial interest in selecting a good variety of cane, such as the diameter of the stalk and whether or not the stalk was solid or pithy. These tests made by Stevens were in accordance with the organizational set-up of the sugar cane investigation project sponsored by the University of Florida. Furthermore, Stevens, on his own initiative, would, when a variety appeared promising in preliminary tests, have plots planted of this variety so that, in the event it proved to be a commercially desirable variety, seed cane would be available to commercial growers without having to wait an additional year for a sufficient seed supply. The evidence shows that Stevens ascertained the commercial possibilities of F30–35 as early as 1932 and that he distributed cane to growers to start seed cane plantings in 1932 and the early part of 1933. The record further shows that Stevens distributed F31–436 and F31–962 more than two years prior to Bourne's applications for patents covering these varieties. Stevens made this distribution only after he realized that the cane had some commercial possibility; and his recognition of commercial possibility in the cane was dependent upon his knowing the sugar yield of the cane, its resistance to disease, and its growth characteristics—the very essence of the claims made in the patent. Stevens keenly felt the need of

commercial growers to get new varieties in place of the disease ridden varieties in common use, as this was the fundamental purpose of the taxpayer financed program of research that was being conducted. His early distribution served to give him varied plantings for test observations, and it also served to put suitable canes in the hands of commercial growers who could expand them into large scale plantings. It is very important to note that Bourne had absolutely no authority whatsoever to direct the work of Stevens, nor did he have any measure of control over the distributions made by Stevens.

Upon considering the rather extended number of defenses filed in this case, the Court has reached the conclusion that the issues are essentially: (1) a test of the validity of the patents, (2) estoppel and/or licensing of the patents, and (3) infringements of the patents.

In considering the validity of the patents, it is necessary to determine what acts constitute invention within the meaning of the plant patent statutes.

The plant patent statute gives any person who has " * * * invented or discovered and asexually reproduced any distinct and new variety of plant * * *.", 35 U.S.C. § 31 [now 35 U.S.C.A. § 161], provided certain other conditions are met, " * * * the exclusive right to asexually reproduce the plant * * *." 35 U.S.C. § 40 [now 35 U.S.C.A. § 154].

■ In order to obtain a plant patent, the statute requires that the patentee do two things: (1) invent or discover a new and distinct variety of plant and (2) asexually reproduce the plant. The record is not clear as to whether Stevens or Bourne made the first asexual reproduction. However, the patents being presumed valid, and there being no positive evidence that Stevens actually reproduced the plants before Bourne, it must be presumed that Bourne, the patentee, first asexually reproduced the plants.

■■ Ordinarily, invention is construed to mean a mental operation involving the conception of an idea, and a physical operation involving reduction to practice of the mental concept. See 69 C.J.S., Patents, § 53a. In this suit, from the point of view of invention, we have a situation remarkably similar to the situation involved in the invention of a chemical compound. Because the properties or utilities of a new chemical compound cannot be definitely determined until the compound has been produced and tested for utility, it is usually held in such cases that conception and reduction to practice are simultaneous acts taking place at the time the characteristics and the utility of the compound are isolated and identified. Smith v. Bousquet, 111 F.2d 157, 27 C.C.P.A., Patents 1136. Invention cannot be predicated on mere speculation or conjecture; it must be based on something ascertained, something definite and certain. Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co., C.C.N.Y., 108 F. 221, affirmed 2 Cir., 113 F. 884, 51 C.C.A. 514. Consequently, the inventor of a chemical compound is held to be the one who first, by actual test or practice, determines the characteristics and utility of the compound. A scientific prediction of the compound's properties or utilities does not make the compound patentable. Smith v. Bousquet, supra.

The record is replete with expert opinion to the effect that only by tedious, repetitious tests can one be certain of the characteristics in a new variety of sugar cane. The Canal Point Station tested a million seedlings and found only twenty new varieties that were worthwhile. The three patented varieties here involved were selected from literally thousands of seedlings. Consequently, there could be no invention or discovery of these patented varieties of sugar cane prior to the time that the plants were grown and their characteristics determined. The patents themselves are for plants which have certain characteristics. One could not claim such a patent until he "discovers" that the characteristics described and claimed for the plant under the patent exist in the plant.

■ The Court finds, as a matter of fact, that the patented plant characteristics

defined in the letters patent were not discovered exclusively by the patentee. It appears from the testimony that the procedure adopted for the determination of distinguishable patentable characteristics was participated in by associates of the patentee who substantially contributed to the final discovery. It is concluded, therefore, that Stevens and Bourne are joint inventors. "Joint inventions are made when two or more persons jointly work or collaborate in devising and putting into practical form the subject-matter of the patent in question." Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 3 Cir., 1934, 72 F.2d 53, 56. Pointer v. Six Wheel Corp., 9 Cir., 177 F.2d 153. It is elementary in patent law that where a patent, is issued to one inventor for a joint invention, that the patent so issued is void. Pointer v. Six Wheel Corp., supra; Smart v. Wright, 8 Cir., 1915, 227 F. 84; Tin Decorating Co. of Baltimore v. Metal Package Corp., 2 Cir., 1930, 37 F. 2d 5. For that reason, the patents in question here are held to be invalid.

It is also worthwhile to analyze another defense which goes to the validity of the patent. In defining inventions which are patentable, Title 35, § 31, U.S.C., provided, as here pertinent, that new inventions may be patented unless, among other things, they have been "in public use or on sale in this country for more than two years prior to his application". 46 Stat. 376.

The extent of the public use is not important for a single use is just as effectual as many to bar the right to a patent. Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755. However, the use must be of the perfected invention or discovery. As a general principle, any non-secret use of the completed and operative invention or discovery in its natural and intended way is a public use within the meaning of the statute. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071. Egbert v. Lippmann, supra; In re Bertram, 88 F.2d 834, 24 C.C.P.A., Patents, 1073. Since a plant variety that can be asexually reproduced is incapable of being perfected or improved in the ordinary sense, any use must perforce be of the completed invention or discovery.

The facts of the present case are clear and undisputed by the parties that the sugar cane varieties covered by the patents in question had a certain distribution and use more than two years prior to plaintiff's applications for letters patent. The plaintiff's evidence does not so much challenge the use in advance of the two year period but seeks to establish the nature of the use. Indeed, it is apparent from the record that the plaintiff was aware of Mr. Stevens' distribution to commercial growers at the time of such distribution.

It is plaintiff's contention, however, that any use of the patented sugar cane varieties more than two years prior to applications therefor was an experimental use and not a public use within the purview of the statute. It is an undoubted principle of law that the experimental use of an invention by or under the control of the inventor for the purpose of testing or improving his invention is not a public use within the meaning of the statute. Electric Storage Battery Co. v. Shimadzu, supra; Root v. Third Ave. R. R. Co., 146 U. S. 210, 13 S.Ct. 100, 36 L.Ed. 946; Smith & Griggs Manufacturing Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000; Bradley v. Eccles, C.C., 138 F. 911. Nevertheless, the plaintiff is not aided by this principle since it is apparent from the record that during his employment at the Everglades Experiment Station, when occurred the development of the patented cane varieties in question, he never possessed the authority to, and was not in control of the distribution or use of these cane varieties. It is also apparent that there were no restrictions placed on early users of the then untried varieties. That principle of law was not meant to enable an inventor to profit by the experimental efforts of others not within his control and direction. To invalidate the patent, it is not necessary that the prior use shall have been with knowledge and consent or allowance

420

of the patentee. Andrews v. Hovey, 124 U.S. 694, 8 S.Ct. 676, 31 L.Ed. 557. And there is no indication of fraud or surreptitiousness to otherwise qualify any public use.

■ It is a question of fact whether there has been such public use within the meaning of the statute as to bar the granting of a valid patent. Lensch v. Metallizing Co. of America, D.C., 39 F.Supp. 838, affirmed 9 Cir., 128 F.2d 654. The Court finds as a matter of fact that there was a public use within the meaning of the statute and that it occurred in the case of each patent more than two years prior to date of applications therefor. The Everglades Experiment Station and the U. S. Sugar Corporation certainly had the later patented varieties for their own purposes and use more than two years prior to patentee's applications. Fellesmere Sugar Co. and E. H. Beckett also provide undisputed evidence of a public use of these three varieties of cane more than two years prior to patentee's applications. Furthermore, it may be stated that such prior use by growers as was established was a definite commercial use in that the growers were expanding available seed to full scale production. Since a single use is sufficient to bar the right to a patent, it is unnecessary to refer to other evidence establishing as a certainty other instances of public use in advance of the two year period. All of these growers were independent of, not subject to, plaintiff's control; were unaware of any restrictions at the time of first use; and made use of the canes for their own purposes.

■ It is concluded, therefore, that there was such a prior public use of the three patented varieties of sugar canes in question as to preclude the granting of a valid patent. Upon taking the view that the patents in question are invalid, it is unnecessary to consider other aspects of the case.

Wherefore, there must be and it is so ordered that there be judgment for the defendant. The Clerk is hereby directed to enter the judgment attached hereto.