Simpson J. ADAMS, Individually; Simpson J. Adams and Myrtle R. Adams, Trustees for: Montez Adams Walker, Ruby Adams Deal, and Simpson J. Adams; and Adams, Inc., Plaintiffs,

v.

COLUMBUS MANUFACTURING CO., Inc.; West Point Manufacturing Company, Inc.; and Dixie Mills, Incorporated, Defendants.

Civ. A. No. 754.

United States District Court M. D. Georgia, Columbus Division.

Jan. 7, 1960.

patent as trustees for Montez Adams Walker, Ruby Adams Deal and Simpson J. Adams; and plaintiff Adams, Inc. is the sole licensee under said patent. At the time suit was filed defendant West Point Manufacturing Company was the parent company of the other two defendants, Columbus Manufacturing Company and Dixie Mills, Inc., its subsidiaries. Said parent company, since the filing of the suit, has assumed the assets and liabilities of said subsidiaries, which now exist only as divisions of West Point Manufacturing Company.

The complaint charges that the defendants infringed all of the claims of the Adams patent by reason of their manufacture, use and alleged sale of a roving frame stop motion designed by one of their employees, Edgar H. Granberry. The evidence is clear that the defendants have not sold any of the Granberry stop motions, but the defendants admit that they made them and used them.

### Patent in Suit

The patent in suit relates to a stop motion designed especially for roving frames, wherein a number of individual, enclosed switches are interposed between drop wires and a pair of parallel conductors on a mounting bar. A roving consists of a delicate strand of loose fibers and is an intermediate form in the manufacture of textile yarns between sliver and finished yarn. A roving frame draws or attenuates a number of slivers in its drafting system, which includes a succession of rolls driven progressively faster, thus reducing the size of the strand. Upon delivery from the rolls, roving strands are wound in layers upon bobbins by rotating flyers to form a package. The yarn delivery points of a roving frame are relatively close together, and the breakage of a roving strand ("an end coming down") after delivery results in loose fibers from the broken end being thrown in a "snow storm" by the rotation of the flyers against adjacent strands, causing other ends to come down in a sort of chain reaction unless the frame is stopped promptly. For this and other compelling reasons it is desirable

Ralph Bailey, Jr., Greenville, S. C., Foley, Chappell, Kelly & Champion, Columbus, Ga., Love, Thornton & Arnold, Greenville, S. C., for plaintiffs.

Eaton, Bell, Hunt & Seltzer, Charlotte, N. C., Hatcher, Smith, Stubbs & Rothschild, Columbus, Ga., Spalding, Sibley, Troutman, Meadow & Smith, Atlanta, Ga., for defendants.

BOOTLE, District Judge.

This is an action for patent infringement. Plaintiff Simpson J. Adams is the former owner and patentee of the Simpson J. Adams patent No. 2754653 issued July 17, 1956, entitled "Stop Motion Devices"; plaintiffs Simpson J. Adams and Myrtle R. Adams are owners of said

that a roving frame be stopped as soon as possible after an end comes down. Without a stop motion, considerable damage may be done before the operator, who may be in another part of the mill, is able to stop the frame.

Prior to Adams' invention, covered by the patent in suit, there was no commercially acceptable electric stop motion for roving frames on the market or available to the mills in spite of a long, unfilled want. The patents relied upon by the defendants are not very pertinent. The textile industry was confronted with a need and a problem. The need was for an electric roving frame stop motion which would reliably stop the frame when the roving broke or became excessively slack. The problem was how to devise such a stop motion possessing such durability and protective features as to permit it to work in the necessarily hostile, lint-laden atmosphere of the cotton mill, and, at the same time, possessing such simplicity and facility for mounting and installation as to be economically feasible and acceptable. The prior art shows that, in spite of the fact that switch casings were notoriously old, no one prior to Adams had been able to supply the need or to solve the problem above stated. No prior patent teaches the solution provided by the Adams combination of drop wires, each engaging a textile strand on one end mounted on a pivoted shaft projecting from each of a number of individual casings operating fixed and movable contacts with parts projecting from the casings making electrical connections by the act of mounting each of the casings on a single bar. The stop motion structure claimed in the patent in suit is an important improvement. The structural elements of this particular Adams combination function in a new way to produce improved results in stopping the roving frame when an end comes down or becomes excessively slack, in a workable, practical way for the first time, and to produce new results in that the necessary electrical connections are made by the act of mounting the individual switch casings upon a bar, which has upon it

two parallel conductors. An obvious advantage in said combination is that it dispenses with the necessity of having a clothesline arrangement for one of the conductors, as illustrated in plaintiffs' exhibit 27 (experiment 9) and plaintiffs' exhibit 32 (experiment 11). In experiment 9 the clothesline arrangement runs outwardly from and in front of the bar, and, in experiment 11, it runs to the rear of the bar, with the necessity of drilling a separate hole through the bar underneath each switch casing for the making of an electrical connection with a projection from the bottom of the casing. In both experiments 9 and 11, in practice objections were found to the clothesline arrangement because of its lint-collecting propensity, its interference with operators when they were doffing by damaging their hands, and its expense of installation, experiment 11 requiring the drilling above mentioned and causing the insulation to cut through and the frame to short out, making it difficult to find the cause of the shorting out in that every spindle had to be checked whether it was as many as 70 or 120. An obvious advantage of the patented combination is that it lends itself to prefabrication in the shop, in which the electrical connections are concluded by the simple act of mounting as many switches as are desired upon the elongated bar, and simply installing a section of the bar in its desired location in the mill.

The inventive concept of the Adams patent in suit makes possible for the first time, after many others skilled in the trade had tried and failed, the practical application of the inventive concept of the expired Adams pioneer patent. After the first successful installation in Abbeville Mills in the spring of 1953, roving frame stop motions constructed in accordance with the teachings of the patent in suit achieved wide acceptance in the textile trade and resulted in great advantage to the textile industry and success to Adams. The acceptability and commercial success of electric roving frame stop motions is dependent upon the new combination of the patent in suit

and is not dependent upon changes in roving frame construction or other changes in the industry. Although higher draft spinning has accentuated the demand, there has been a wide market since before 1948; others had tried to meet the need and failed, until the invention of the patent in suit was perfected in the spring of 1953 at Abbeville Mills. All save the named defendants have respected the patent in suit since its issuance on July 17, 1956.

### "In Public Use or On Sale"

The many differences between the patented combination and all of Adams' former experimental models, including the differences above indicated, dispose of the defendants' contention that, by reason of said former models, the invention patented was "in public use or on sale in this country more than one year prior to the date of the application for patent." The patent in suit was applied for on October 26, 1953 so that the critical date with respect to "in public use or on sale" is October 26, 1952.

The court has found of considerable help in its study of this case the large display board disclosing plaintiffs' exhibits 7 (experiment 1), 9 and 9C (experiment 2), 12 (experiment 3), 13 (experiment 4), 16 (experiment 5), 20 (experiment 6), 24 (experiment 7), 25 (experiment 8), 27 (experiment 9), 29 (experiment 10), 32 (experiment 11), 33A (experiment 12), 35 (experiment 13), 36 (experiment 14), and 37 (Current Model 1955). Adams did not complete his invention until the spring of 1953, with the addition of the mounting and the particular contact structure in the form of the small spring supplied in the casing, thereby dispensing with the external electrical connection, shown in plaintiffs' exhibit 32 (experiment 11), and inasmuch as all prior models were experimental and incomplete, this invention successfully withstands the attack that it was in public use or on sale more than one year prior to the application date. It was not completed until the spring of 1953, and the application was made in October of that year.

Where this defense of public use or on sale is interposed, the primary inquiry is one of identity between two things. Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., D.C.M.D.Ga.1958, 165 F.Supp. 307. As is above indicated this court finds that the identity necessary to that defense does not exist, but, even if it did, "[a] use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal, and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment." Smith & Griggs Mfg. Co. v. Sprague, 1887, 123 U.S. 249, 256, 8 S.Ct. 122, 126, 31 L.Ed. 140. This court finds that the rather extensive use of these experimental models by Adams in a limited number of cotton mills was substantially and primarily for purposes of experiment. Adams did not own cotton mill machinery upon which the necessary tests could be conducted. It was necessary, therefore, that the tests be conducted in cotton mills owned by others. It was necessary, also, to experiment in as many as six mills because all mills do not have the same type roving frames and are not producing the same material. The fact that these experimental models were sold to the mills in which the experiments were conducted does not defeat the experimental character of the tests so long as the use was substantially and predominantly for purposes of experiment, Smith & Griggs Mfg. Co. v. Sprague, supra, and so long as the sales feature was naturally incidental to the experimental operation. "Experimental use is never public use within the meaning of the statute, if it is conducted in good faith for the purpose of testing the

qualities of the invention and for no other purpose not naturally incidental to that." 1 Walker Patents sec. 84 [at 347] (Deller's ed. 1937). In order that a favorable test might be conducted, it was necessary for Adams to overcome the natural hostility of textile employees to the introduction of new machinery which alters their modus operandi. This could be done only by obtaining first a favorable view of the innovation on the part of the superintendents and other managerial personnel of the mills. This could more easily be accomplished when the mills had a financial stake in the apparatus. It furthered these experimental operations for Adams not to make any installations on an outright trial basis. All of the installations made prior to the critical date were removed and discarded as being unsuccessful. In some if not in all instances, Adams later made financial adjustments with the purchasers. No profits were realized from the sales of the stop motion switches in 1952. The experiments resulted in changes which made practical commercial operation possible and led to the perfection of the invention. The inventor is entitled to perfect and to properly test his invention before the statutory period begins to run. Elizabeth v. Pavement Co., 1878, 97 U.S. 126, 24 L.Ed. 1000; Graham v. McCormick, C.C.N.D.Ill.1880, 11 F. 859; Kerner Incinerator Co. v. Townsend Estates, D.C.N.D.Ohio 1926, 27 F.2d 599; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530; Progressive Engineering, Inc. v. Machinecraft, Inc., D.C.D.Mass.1959, 169 F.Supp. 291; National Biscuit Co. v. Crown Baking Co., 1 Cir., 1939, 105 F.2d 422; Bourne v. Jones, D.C.S.D.Fla.1951, 114 F.Supp. 413, affirmed, 5 Cir., 1953, 207 F.2d 173.

Old or New Combination of Elements

■ Defendants contend that claims 1, 2, 3, 4, 8 and 9 of the patent in suit are invalid as claiming an old and no longer patentable combination of elements, and rely heavily upon Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S. Ct. 662, 82 L.Ed. 1008. The court finds, however, that this patent covers a new combination of elements, that this new combination functions in a new way to produce new and improved results and that the parts contended to be old perform a new function in the combination. Where this it true, the Lincoln Engineering doctrine does not apply. E-I-M Co. v. Philadelphia Gear Works, 5 Cir., 1953, 205 F.2d 28.

■ Much of the contention in this case grows out of the fact that, on September 11, 1937, Adams and an associate applied for and, on September 13, 1938, obtained patent No. 2129639, captioned stop motion for roving frames, it being defendants' contention, among others, that Adams obtained a seventeen-year monopoly under his said first patent and that, under the patent in suit, he is attempting to extend his monopoly on substantially the same invention. This court finds against the defendants on this contention, and, inasmuch as defendants contend that Adams' patent No. 2129639 (hereinafter referred to as Adams I) is the most pertinent prior art and that the parts there function in the same manner as the parts in the patent in suit, this court adopts the following paragraphs from plaintiffs' brief as demonstrating that the new combination of elements claimed in the patent in suit functions in a new way to produce new and improved results:

"The drop wire 13 of Adams I (P-8), in one embodiment thereof, is pivotally mounted on a *fixed* pin 13a and projects upwardly from within an open continuous bar 11. The drop wire functions as a movable contact by engaging fixed contacts 14a and 14b mounted on either side thereof above the pin. In the modification shown in Adams I, the drop wire is similarly mounted but carries a lower projecting portion 13c in Figures 4 and 5 which operates as a movable contact to engage fixed contacts 14a and 14c mounted on either side thereof below the pin.

"In the patent in suit (P-1) the drop wire 8 is mounted on the projecting end of a shaft 9 which is journaled in an individual switch casing 10. The drop wire functions to turn the shaft which carries a movable contact 9b within the casing to engage a fixed contact 14c. The fixed contact functions through a part projecting from the casing 14b to close the circuit between the conductors 14 and 13 carried by mounting bar 11. The conductors are mounted in parallel upon the mounting bar so as to be engaged by the parts projecting from the casing 14b and 16 which make electrical contact with the fixed and movable contacts, respectively, upon the mounting of the individual switch casings upon the bar * * *.

"New results are achieved through this new functioning of the elements of the new combination in that the necessary electrical contacts are made by the act of mounting the casings upon the bar. The switch casings may be removed from the bar by the same means as they are mounted. Improved results are produced in that an electrical stop motion structure which is commercially acceptable has been provided for the first time * * *.

"Defendants now contend that certain parts have no new function in the combination of the patent in suit and contend that it makes no difference whether or not the shaft is fixed or rotatable since the function is the same. This is without merit because it is most important in Adams II that the shaft rotate so that the contacts within the casing may function responsive to an externally mounted drop wire. The shaft of Adams I is fixed and the drop wire which extends upwardly from the open bar pivots thereon to operate the exposed contacts. In Adams I the fixed shaft does not operate the movable contact so that it would be impossible through the use of the fixed shaft to enclose the switch contact mechanism. This difference in function is important because in connection with the other elements of the new combination, a new result is achieved in the form of a substantial enclosure for the switch contacts combatting the ever present lint accumulations. The parts projecting from the casing function to engage the specially mounted conductors and the switch contacts within the casing to result in making electrical contact upon the act of mounting the casing upon the bar. Thus, all the parts of the new combination claimed in the patent in suit function in a new way to produce new and improved results."

"A combination is patentable though each of its constituent elements was well known in the prior art, if the combination produces a new and useful result and not merely the aggregate of several old results or if it produces an old result in a cheaper or otherwise more advantageous way. 40 Am.Jur., Sec. 19, p. 543." Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 1949, 176 F.2d 783, 790.

"A combination whether composed of all old, or some old and some new elements, is patentable if it achieves an altogether new and useful result. Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 242 F.2d 17; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783. The life of such a combination is not to be destroyed by excision of its several parts without benefit of anaesthesia, nor is the cause of its vitality to be discovered by the prosector's retrospective dissection. Jeoffroy Mfg., Inc. v. Graham, 5 Cir., 206 F.2d 772, 776." Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, 194.

"[A]n improvement combination is patentable even though its constituent elements are singly revealed by the prior art, where, as here, it pro-

duces an old result in a cheaper and otherwise more advantageous way." Jeoffroy Mfg. v. Graham, 5 Cir., 1955, 219 F.2d 511, 519.

Many of the contentions raised by the defense are disposed of by the reasoning of Jeoffroy Mfg. v. Graham, 5 Cir., 1953, 206 F.2d 772, 777, in which the court stated:

> " * * * Graham, was the first to perfect the idea of resilient and frictional engagement of the shank of a ground working tool between a fixed part and a movable part, or between the bracket on the H-Beam and the fulcrum plate pivotally mounted on the bracket."

### Presence or Lack of Invention

■ Defendants contend further that the claims of the patent in suit do not define a patentable invention under the statutory and case law for that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C.A. § 103. On this question, which is usually the threshold question in any patent case, objective criteria affords little help. Robertson Rock Bit Co. v. Hughes Tool Co., supra. Each must stand upon its own bottom, and the facts of other cases are of limited assistance.

> "It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention." Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 129, 95 L.Ed. 162.

> "It is true that the combination must represent something more than the ordinary skill of the average mechanic, but, speaking prosaically rather than poetically, it is not true, as is sometimes claimed, that patents to be valid must be the result of, must embody flashes of ' genius."

Robertson Rock Bit Co. v. Hughes Tool Co., supra.

Paraphrasing freely from page 790 of 176 F.2d of Robertson Rock Bit Co. opinion: This court confronted with Adams' combination producing a materially different and more advantageous result has examined the particular changes made in the light of the art at the time the device was developed and has decided that inventive skill produced the change and that mechanical aptitude was not responsible.

### Identity of Inventor

■ Defendants contend further that, if validity would otherwise attach to the patent in suit, it cannot attach because Adams did not invent the subject matter of the patent. This contention more specifically is that Wesley E. Lane of Saco-Lowell Shops and Leroy Wallrab, design engineer at Patent Button Company, designed the switches of the patent in suit. It is true that, based on information from Adams, Lane did make designs of the switch embodied in plaintiffs' exhibit 20 (experiment 6) and, based upon information from Adams, Wallrab did make designs of the switch embodied in plaintiffs' exhibit 24 (experiment 7), but said switch designs, absent Adams' subsequent modifications and improvements, resulted in failure. Lane did not invent the subject matter of the patent in suit because he did not contemplate the use of individual casings, among other things, but rather employed a continuous housing in a different combination from that claimed in the patent in suit. By letter, plaintiffs' exhibit 23, Mr. Frank Lowell stated: "The only thing was we could not find a way of making it work without the advantages of the stop motion being offset by mechanical and electrical difficulties." The Saco-Lowell design and experiments were abandoned and have little, if any, relevance other than affirming the need for the invention and demonstrating that Saco-Lowell was unable to provide a successful stop motion.

■ With respect to the work done by Wallrab on the switch, plaintiffs'

exhibit 24 (experiment 7), Adams contacted Phil Worth, a salesman of textile equipment, showed him the stop motion and asked him if he was interested. Worth then asked Adams for permission to find someone to manufacture or finance the stop motion so that Worth could do the selling. Adams told Worth to go ahead and see if he could line up someone that would finance him and let him do the selling. Phil Worth went to Patent Button Company. Adams furnished instructions to Patent Button Company, carrying to them a book of photographs and a cut-out model like the earlier Abbeville job, and gave them all the information he could to help them come up with an enclosed, individual casing which he was trying to do. The plexaglass model, plaintiffs' exhibit 24 (experiment 7), was made by Snap Vent under Patent Button's instructions. Adams also carried to Patent Button the Saco-Lowell model, plaintiffs' exhibit 20 (experiment 6). He gave them all the information he could from the photographs and the Saco-Lowell model, and told them that he wanted an enclosed casing, but to forget the Saco-Lowell model as that one had already proved itself not practical; that it had to be an enclosed casing, with the shaft extending outward in order to fasten the drop wire, because "there's only one way to fasten the dropwire and that's with the shaft extending outward, out in front of the casing". Adams had already given about the same information to Phil Worth. Mr. Adams was asked: "Was there any information given to you, other than your own, which was helpful in the final construction of your stop motion?" He replied: "No, I couldn't say that they did, because Patent Button, I don't think had any idea—they manufacture buttons for sewing on garments and buttons for stoves and refrigerators and that sort of thing—and they had no idea in the world what we were talking about when we said a roving frame and a stop motion; it didn't make sense to them. And, of course, Phil Worth, is just a textile salesman." Mr. Wallrab testified, in effect, that he designed this particular Snap Vent switch and that, prior to that time, he "was told the basic principle of which the switch would have to work under and the conditions under which it would have to work * * * mainly that the switch was to control a spinning machine, the roving machine, and that the roving would be passed through a metal wand * * * and that it should be a closed switch so that to make it as dust free as possible, and that it would be very little friction, as little as possible, designed into the switch, and how it was to be * * * basically how it was to be mounted on the machine. That type of information was relayed to me." Mr. Wallrab was, at first, of the opinion that Mr. Adams related that information to him, but apparently he did not see Adams personally until a later date. The court finds that said information came to Wallrab from Adams, directly or indirectly, by or through Phil Worth. While some credit must be given to Wallrab for the particular design of the Snap Vent switch, this does not militate against Adams because an inventor may seek and use the engineering skill of others in order to perfect his invention. It should be noted that Wallrab claims no credit as an inventor, and testifies that a design such as this is within the ordinary skill of a design engineer such as he, and that Adams particularly wanted the wand (drop wire) and the enclosed case and that the switch which he designed is merely an improvement on Adams' basic design. The settled rule of law with respect to this right of an inventor to seek and use the engineering skill of others in order to perfect his invention is set out and discussed in Agawam Woolen Co. v. Jordan, 1869, 7 Wall. 583, 602–603, 19 L.Ed. 177, 181–182, and has been recently restated in Pointer v. Six Wheel Corporation, 9 Cir., 1949, 177 F.2d 153. The fact that the patent was issued in Adams' name is, in itself, prima facie proof that he was the sole inventor, and the burden is upon those who make an assertion contrary to that presumption to prove it. Pointer v. Six Wheel Corporation, supra. The defendants have not carried that burden in this case.

Moreover, as stated in the Agawam case:

> "He is the inventor and is entitled to the patent who first brought the machine to perfection and made it capable of useful operation."

Adams personally took the Snap Vent plexaglass switch to which Wallrab contributed, cut the hole through the upper posterior portion of the casing and designed and inserted therein the extension of the ring element so as to make contact with the upper conductor strip, thereby dispensing with the objectionable clothesline arrangement and making possible for the first time the necessary electrical contacts by the mere act of mounting the switch. This is demonstrated by plaintiffs' exhibit 33A (experiment 12). Thereafter, Adams personally made further changes in the switch and casing by causing the ring element to project through the lower posterior portion of the casing and by inserting therein a metal spring to form the direct contact between the ring element and the lower bus bar through the mere act of mounting the switch (plaintiffs' exhibit 35, experiment 13). This last-mentioned modification of the switch and its component parts completed the patentable combination except that the parallel conductors in plaintiffs' exhibit 35 (experiment 13) were found to be insufficient, and the heavier conductors imbedded in the wooden bar were adopted as in plaintiffs' exhibit 36 (experiment 14), which new combination made possible the first commercially successful operation and was embodied in the patent in suit.

### Presumption of Validity

Defendants' contention that the patent in suit cannot be presumed valid is based upon two assumptions— first, that Adams I constitutes the most pertinent prior art, and, second, that said patent was overlooked by the patent office. They invoke the rule that, where the patent office has failed to consider pertinent art, the statutory presumption of validity is greatly weakened if not completely destroyed. Fritz W. Glitsch & Sons, Inc. v. Wyatt Metal & Boiler Works, 5 Cir., 1955, 224 F.2d 331; Cornell v. Adams Engineering Company, 5 Cir., 1958, 258 F.2d 874; Murray Company of Texas, Inc. v. Continental Gin Co., 5 Cir., 1959, 264 F.2d 65. The presumption of validity is statutory, 35 U.S. C.A. § 282, and the rule is that the burden of establishing invalidity of a patent shall rest on the party asserting it, and that any reasonable doubt will be resolved against the party asserting invalidity. Cameron Iron Works v. Stekoll, 5 Cir., 1957, 242 F.2d 17, 20. Defendants' argument that the patent office did not consider Adams I is based upon the fact that the patent office did not cite that patent. This fact does not carry defendants' burden of proof. In the case of Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 1953, 208 F.2d 1, 4, it was said:

> "It has been held, and we think with logic, that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked [citing cases]."

Furthermore, references not of record in the patent office cannot weaken the statutory presumption if they do not involve some substantial element in the defense of anticipation which was not considered by the patent office. Otto v. Koppers Company, 4 Cir., 1957, 246 F.2d 789, 801. At first blush it may appear that Adams I is more pertinent than the Sawtell patent 1372556, the Cocker patent 1678975, and the Cone patent 2444553, cited by the patent office, but a careful analysis of the patent in suit, Adams I, and the Sawtell, Cocker and Cone patents convinces this court that it cannot be said that Adams I constitutes the most pertinent prior art. Defendants' contention that it does is consistent with their contention that the patent in suit is nothing more than an attempt to repatent the same combination of old elements patented in Adams I. In this contention this court thinks defendants are in error. The basic inventive concept in Adams I is that of supporting a drop wire for tiltable movement without exerting appreciable weight upon the

roving, while the patent in suit is an important improvement, in that it teaches the important novel concept of individually enclosing the switch contacts so as to be operated by such drop wires mounted externally of the casings, while making necessary electrical connections by the act of mounting the casings upon a single bar. No representation is made in the patent in suit with respect to the novelty of the concept of thus tiltably supporting a drop wire. The pertinency of a reference must be to the combination claimed, since it is the claims which define the invention, rather than, or certainly as much as, the disclosure of the patent application. Defendants insist that Adams I shows a combination of drop wires, switches, a bar and conductors. The Sawtell patent, in figure one, shows graphically the drop wire, the switch, and the bar. The insulated conductors are shown in Cocker, figure 5, and conductors are also shown in Cone, figure 4. Cone and Cocker were cited to show drop wire arrangements operating in conjunction with a mounting carrying parallel bus bars in other combinations. Inasmuch as the Adams pioneer concept is not claimed in the patent in suit, it appears that the cited references are at least as pertinent as Adams I.

This court finds and concludes further, however, that the validity of the patent in suit is not dependent upon the statutory presumption of validity, and has been sufficiently established by plaintiffs' evidence without dependence upon such presumption.

### Infringement

■ The plain and clear language of claims 1, 2, 3, 8 and 9 of the patent in suit applies, word for word, to the accused Granberry stop motion, and these claims are infringed. The plain and clear language of claims 4, 5, 6 and 7 applies, word for word, to said accused stop motion, with the exception of the recitation of a "slot" and a "plate". The flat surface of the movable contact of the accused stop motion is the full equivalent of a "slot", and the round threaded projection of the fixed contact of the accused stop motion is the full equivalent of the "plate", since they operate substantially the same way to produce the same result. Therefore, these claims are infringed.

Parks-Cramer Company of Fitchburg, Massachusetts, on or about January 20, 1958, purchased West Point's rights in the accused stop motion and, as a part of the consideration, agreed to defend West Point in any suit on the patent in suit, and to indemnify West Point with respect to damages and costs which might be assessed against it. The Parks-Cramer Company actively and avowedly conducted the defense of this suit, managed and directed the progress of the trial at its expense and under its supervision. The outcome of the trial, if favorable, would have resulted in its benefit and, if adverse, in its detriment.

### Admissibility of Evidence

■ ■ Parks-Cramer Company, on or about February 12, 1958, through its officials and representatives, called at the offices of plaintiff Adams, Inc. in Greenville, South Carolina, where a conference was held. The conference was reported stenographically, and a transcription of these conference notes was tendered in evidence by plaintiffs as plaintiffs' exhibit 43, consisting of 8½ pages. This tendered evidence was strenuously objected to by defendants upon the ground that the entire conference was in an effort to compromise some differences, and that, for that reason, everything that took place at the conference was inadmissible and could not be segregated. The court then suggested to counsel the possibility of their looking over the notes and perhaps agreeing upon the admissibility of some portions and the inadmissibility of others. Plaintiffs' counsel took the position that everything in the notes was admissible. The court did not, at the trial, examine these notes, but admitted them tentatively, not ruling on the objection. Recently the court has examined this exhibit sufficiently to determine that the purpose of the conference was to adjust the existing differences between the parties as to the validity or invalidity of the patent in suit and as to

the right or lack of right on the part of Parks-Cramer to manufacture, use and sell the accused stop motion, and the court has determined further that said document contains "propositions made with a view to a compromise, [and] are not proper evidence." 38 Ga.Code Ann. § 408. Should there be in this document any portions which could be segregated and harmlessly admitted in evidence, no duty of dissection devolves upon the court. "When evidence is offered as a whole and a part is inadmissible, it is not error to disallow the whole." Green, Georgia Law of Evidence sec. 11 [at p. 31] (1957); Dorsey v. Dorsey, 1940, 189 Ga. 662, 671, 7 S.E.2d 273. Accordingly, defendants' objection to this exhibit is sustained, and said exhibit is excluded.

### Conclusion

The plaintiffs are entitled to a permanent injunction against further infringement of the patent in suit by the defendants and are entitled also to damages from the defendants for infringement of the patent in suit and the costs of this action.

Let counsel for plaintiffs prepare a decree in accordance herewith, submitting same to counsel for defendants who shall have 15 days after receipt of same for suggestions as to form.